NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 07-15302 |
| | : | |
| LAURA STEERS | : | Chapter 7 |
| | : | |
| Debtor | : | |
| | : | |
| LAURA STEERS | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Adversary No. 07-1902 |
| | : | |
| NEW JERSEY HIGHER EDUCATION | : | |
| STUDENT ASSISTANCE AUTHORITY | : | |
| | : | **MEMORANDUM OPINION** |
| Defendant | : | Hearing Date: April 17, 2008 |
| | : | |

## <u>APPEARANCES</u>

Martha Gonzalez, Esquire
LEGAL SERVICES OF NORTHWEST JERSEY, HUNTERDON DIVISION
82 Park Avenue
Flemington, New Jersey 08822
Attorney for Debtor/Plaintiff

Susan G. Steinman, Esquire
SCHACHTER PORTNOY, L.L.C.
3490 U.S. Route 1, Suite 6
Princeton, New Jersey 08540
Attorney for Defendant

THE HONORABLE KATHRYN C. FERGUSON, USBJ

On July 13, 2007, Debtor Laura Steers filed a one count Complaint to Determine Dischargeability of Student Loan. The Complaint sought a hardship discharge pursuant to 11 U.S.C. § 523(a)(8). The trial commenced and concluded on April 17, 2008. The court reserved decision. The following are the court's proposed findings of fact and conclusions of law.

### Factual Findings

Laura Steers filed her Chapter 7 petition on April 18, 2007. The Chapter 7 Trustee issued a Report of No Distribution on May 22, 2007, and the Debtor received her discharge on July 17, 2007.

Ms. Steers incurred a debt to the New Jersey Higher Education Student Assistance Authority (NJHESAA) by way of two student loans dispersed by Sallie Mae to pay expenses at the County College of Morris (CCM). Ms. Steers enrolled at CCM with the intention to obtain a degree as a medical laboratory technician. She attended CCM from January, 1994 through approximately October , 1995, when changes in the course work convinced her that she was not suited to work in the medical field. The principle indebtedness on her students loans was $5,250.00. The total outstanding amount on these loans as of the date of default was $6,884.61.

Historically, Ms. Steers had consistently worked at a variety of low-paying jobs. She made payments on account of her student loans totaling $1,581.74. She testified that she was able to make those payments only because she continued to live with her parents at minimal expense to her. In approximately 1995, she obtained employment as a truck dispatcher. With more gainful employment, Ms. Steers moved out of her parents' home, but she soon ran into financial difficulties. Although she continued to work as a truck dispatcher until 2002, she sought and received a number of forbearances on the loans, beginning in March, 1998 and continuing intermittently until May,

2

2004.

In April, 2003, Ms. Steers was raped and sexually assaulted. Although Ms. Steers's testimony was inconsistent about when she initially sought psychotherapy, it is consistent that after the attack she attended therapy sessions at least twice per week. She was also hospitalized for severe depression and potential suicide in 2004. She has been diagnosed with  Major Depression, Recurrent, Severe; Generalized Anxiety Disorder with Panic; Pain Disorder associated with Medical Problems; Post Traumatic Stress Disorder; and Opiod Dependence in Remission.  Her current medications include Vicodin for pain and Klonopin for anxiety. Ms. Steers has previously been prescribed anti-depressants, but discontinued their use after the development of possible medical complications.

In addition to her psychological issues, Ms. Steers testified that she has suffered from Spinal Cervical Stenosis discovered shortly after a car accident in 1995 or 1996. She received cortosteroids for the condition until the development of possible medical complications. Ms. Steers testified that the only other treatment available for Spinal Cervical Stenosis is surgery, but that her doctors are reluctant to under take the surgery because she is only 38 years old. She is currently only receiving palliative care. Ms. Steers testified that this disorder leaves her unable to lift more than 10 pounds, or to stand or sit in the same position for more than 30-45 minutes. She has chronic pain and has been unable to engage in physical activites she previously enjoyed, such as exercising  and playing hockey.

Ms. Steers testified that her more recent medical complications include some suspicious bloodwork that is being monitored by her physicians. She also says that her physician suspect a possible eating disorder or bi-polar disorder. Ms. Steers states that she is fatigued and irritable as

3

either a  side effect of the drugs that she is taking or from the underlying disorders she suffers. She remains very susceptible to teary breakdowns, and has trouble motivating herself.

Since the attack in 2003, Ms. Steers has not been able to obtain and sustain employment. Her physician, Dr. James Rea, attributes that inability to a combination of her comorbid psychiatric disorders compounded by her physical problems and pain. Dr. Rea has rendered an opinion that Ms. Steers is unemployable , apparently for the same reasons.  He has not opined as to her prognosis or future employability.

At the time she filed her petition, Ms. Steers was collecting unemployment benefits in the amount of $950.30 per month. Since that time, her financial situation has declined precipitously. Currently, she receives $200.00 per month in General Assistance, $124.00 of which is paid directly for her rent in subsidized housing, leaving a balance of $74.00. She also receives $120.00 per month in food stamps, although there was some testimony about a recent reduction. She pays utilities of approximately $27.00 per month, approximately $2.00 per month for a P.O. Box and occasional minutes for her cell phone. She has no health insurance: some of her medical bills are covered by Medicaid and others are provided by her doctors or organizations on a charitable basis. She owns an old car, but does not drive it because she cannot afford the insurance. She is driven to her doctor appointments and to errands by a charitable organization.

Ms. Steers has twice applied for a determination of Total and Permanent Disability from the NJHESAA. One of those applications remains pending because of certain deficiencies in the submission. Ms. Steers testified that approximately 8 years ago she had sent a letter to the NJHESAA requesting an alternative repayment plan, but did not receive a response. Ms. Steers has recently applied for Social Security Disability, but has not yet received a determination of eligibility

for those benefits.

## Legal Analysis

The legal question before this Court is whether the Debtor's Chapter 7 discharge included the debt she owes to NJHESAA on account of her educational loans.  Typically, such loans are not dischargeable in bankruptcy; however, there is an exception if "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents ...."  11 U.S.C. § 523(a)(8).  The Bankruptcy Code does not define the term "undue hardship," leaving that to judicial development.  The Third Circuit Court of Appeals has adopted the definition of "undue hardship" first promulgated in Brunner v. New York State Higher Educ. Services Corp. (In re Brunner), 831 F.2d 395 (2d Cir. 1987).  Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298 (3d Cir. 1995).  In Brunner, the Second Circuit Court of Appeals held that an individual satisfies the undue hardship requirement of § 523(a)(8) if:

> 1) The debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans;
>
> 2) Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> 3) The debtor has made good faith efforts to repay the loans.

Brunner at 396.  The Third Circuit adopted the Brunner test as the most consistent with the policies underlying the Code because it did not require a debtor to live in abject poverty in order for a student loan to be dischargeable.  Faish, 72 F.3d at 305.

The debtor has the burden of establishing all three Brunner elements.  Id. at 306.   To advance the fresh start policy underlying the Bankruptcy Code, courts should construe discharge exceptions in favor of the debtor.  In re Pelkowski, 990 F.2d 737 (3d Cir. 1993).

5

The first prong of the undue hardship test requires a debtor to prove that based on her income and expenses, she could not afford to maintain a minimal standard of living if forced to repay the loans. Faish at 306.  As the Third Circuit noted in Faish, '[t]he first prong of the Brunner analysis requires more than a showing of tight finances." Id.  If the loan can be paid by "short-term, belt tightening" then the first prong is not satisfied.  Id. at 307.

The Third Circuit has not defined what a "minimal standard" of living is, but several courts have held that it does not mean a debtor has to live in poverty.  See, Ammirati v. Nellie Mae, Inc. (In re Ammirati), 187 B.R. 902, 906 (D.S.C. 1995)(debtor should not be forced to sell his house to lower his expenses); Nary v. The Complete Source (In re Nary), 253 B.R. 752, 763 (Bankr. N.D. Tex. 2000);  Hoyle v. Pennsylvania Higher Educ. Assistance Agency, 199 B.R. 518, 523 (Bankr. E.D. Pa. 1996).

Based on the standards derived from these cases, it is clear that Ms. Steers's standard of living is "minimal".  She is unemployed and her sole source of income is public and charitable assistance.  While this has enabled her to avoid  homelessness, her lifestyle could hardly be described as anything beyond subsistence.  She has apparently eliminated some of the minimal expenses listed as of her petition date as her income has declined: she testified that she no longer has cable television, and no longer buys cigarettes. After rent and basic utility expenses, she has on average $45.00 per month to spend on all non-food necessities.  She testified that there are times that she goes without food because she cannot afford it and cannot get a ride to the food bank.  This is not a situation where a little "belt tightening" would enable her to repay her student loans.  Faish at 307.

NJHESAA points to the fact that Ms. Steers did not even investigate eligibility for the

William D. Ford Direct Loan Program pursuant to 34 C.F.R. § 685.216, and implied that the program could make Ms. Steers's repayment schedule minimally burdensome. While it is generally advisable that debtors pursue adjustment of their repayment terms through the Ford Program, it is not at all clear that the Ford Program could offer even a minimal monthly payment that Ms. Steers could currently afford. Several courts have rejected the argument that the Ford Program is required and discharged student loans even in situations where the debtor's repayment was minimal or zero. *See,* In re Cheney, 280 B.R. 648, 664-66 (N.D. Iowa 2002)("the William D. Ford Program is no silver bullet for student loan creditors to avoid discharge of student loan debts owing to undue hardship"); In re Fahrer, 308 B.R. 27, 35 (Bankr. W.D. Mo. 2004). The court in In re Limkemann, 314 B.R. 190, 196 (Bankr. N.D. Iowa 2004) noted that the danger of forcing a debtor whose non-student loans have been discharged into a such a program was significant. The Court pointed out that in the worst situations such programs offer repayment amounts that are so low that the payments have very little or no effect in reducing the loan principal. Id. at 196. As a result, interest is accrued for the full term of the loan, which may be up to twenty-five years. Id. The Court also noted that in the event the loan is eventually forgiven, such forgiveness could be taxable, and the tax liability would likely be non-dischargeable in bankruptcy. Id.

The totality of the evidence presented suggests that the Debtor has met her burden of establishing the first prong of the Brunner test, that she cannot maintain, based on current income and expenses, a 'minimal' standard of living if forced to repay these student loans.

The second prong of the Brunner undue hardship test requires the debtor to prove that the inability to maintain a minimal standard of living will continue for a significant portion of the loan

repayment period.  Brunner, 831 F.2d at 396.  In Faish, the Third Circuit did not interpret the last

two prongs of the Brunner undue hardship test because the debtor failed to satisfy the first prong.

Faish, 72 F.3d at 306 (if any of the elements of the test are not met, the inquiry ends and the loans

cannot be discharged).  The Third Circuit later had an opportunity to address the second Brunner

prong and noted that it "is a demanding requirement".  In re Brightful, 267 F.3d 324, 328 (3d Cir.

2001).  In that case, the court held that it is not enough for a debtor to prove that he has no current

capacity to pay his debt; it must be established that this incapacity will continue into the future, for

reasons outside the debtor's control.  Brightful at 328.

     Numerous courts have found that psychological problems should be included in the

additional circumstances likely to persist for a significant portion of the repayment period of the

student loan.  *See, e.g.*, Credit Mgmt. Corp. v Polleys, 356 F.3d 1302, 1310-11 (10th Cir. 2004);

Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey), 287 B.R. 132, 143-44 (Bankr. D. Vt.

2001); Oswalt v. University at Buffalo (In re Oswalt), 215 B.R. 337, 340-41 (Bankr. W.D.N.Y.

1997).

     The evidence adduced in this case demonstrates that Ms. Steers struggles with serious

psychological issues.  She has been treated at a mental health facility and continues to receive

pharmacologic and therapeutic treatments from a counselor.  As noted above, she has been

diagnosed as suffering from a host of psychological problems. In addition, she testified that she has

encountered physical setbacks that have prevented her from taking all of the medication

recommended to address some of her psychological needs. She testified that she suffers from spinal

cervical stenosis, and that it severely limits her ability to stand or sit in certain positions for even

short periods of time, and her ability to lift more than ten pounds. This condition causes persistent

pain. Ms. Steers has also had some abnormal blood work, and although she has not yet been diagnosed, she fears the possibility that the blood abnormality forebodes lymphoma or serious blood marrow disease. The court has little difficulty concluding that Ms. Steers is unable to work in her current conditions.

The difficulty arises with the second half of the second <u>Brunner</u> factor.  Dr. Rea has not opined  as to whether Ms. Steers's  incapacity will continue into the future, through a significant portion of the repayment period.  Ms. Steers convincingly testified that she is making every effort to recover from her impairments, but she is not qualified to testify how long the conditions will persist. Ms. Steers's counsel notes that many of her conditions cannot be "cured." Even if the Court could take judicial notice of that assertion, it does not address whether the combination of medications and counseling could help Ms. Steers manage her disease to the point where she could become employed. Since Dr. Rea's opinion of her employability is clearly in the present tense, the record is devoid of evidence that Ms. Steers's condition is likely to persist for the foreseeable future.

The third prong of the <u>Brunner</u> test requires the debtor to prove that he has made good faith efforts to repay the loans.  <u>Faish</u> at 306.  This prong has recently been addressed by two bankruptcy courts in New Jersey.  In <u>In re Rivera</u>, 284 B.R. 88 (Bankr. D.N.J. 2002), the court found good faith where the debtor had paid for the first year of a ten-year repayment plan, but stopped when psychological problems prevented him from keeping his job.  Courts have also found good faith where the debtor's financial condition was caused by factors beyond the debtor's control.  In <u>In re Williams</u>, 296 B.R. 128 (Bankr. D.N.J. 2003), the court found good faith even though the debtor did not make a single payment on student loans because of her grave medical condition.  In a non-precedential decision, the Third Circuit has stated that it agrees with the approach taken by other

Courts of Appeals in that the good faith analysis must consider: "(1) whether the debtor incurred substantial expenses beyond those required to pay for basic necessities and (2) whether the debtor made efforts to restructure his loan before filing his petition in bankruptcy." Pelliccia v. United States Dep't of Education, 67 Fed. Appx. 88, 91 (3d Cir. 2003).

Ms. Steers started making payments on her student loans soon after they became due. She sought forebearances, but she testified that even with deferments, something always happened that kept her from getting back on a repayment track. She does not appear to have incurred substantial expenses beyond those required to pay for basic necessities during the loan repayment period: For example, she testified that she lived with her parents and later with roommates and she owns and owned only an older car. There was no testimony regarding extravagant trips or purchases, other than a trip to Holland that was apparently funded by her parents. The extreme psychological difficulties from which she now suffers appear to have been triggered or intensified by the rape in 2003 , something certainly beyond her control.

Ms. Steers also testified that approximately eight years ago she had sent a letter to the NJHESAA requesting an alternative repayment plan, but did not receive a response. She admitted that she did not seek assistance through the William D. Ford Direct Loan program pursuant to 34 CFR § 685.216. While application to the Ford Program is not an absolute bar to discharge, see, e.g. In re Cheney, 280 B.R. 648, 664-66 (N.D. Iowa 2002); In re Fahrer, 308 B.R. 27, 35 (Bankr. W.D. Mo. 2004); In re Limkemann, 314 B.R. 190, 196 (Bankr. N.D. Iowa 2004); the failure to even explore that option makes it difficult to assess future ability to make restructured payments.

The fact that Ms. Steers did not apply for relief under the Ford Program makes the question on good faith somewhat of a close call. Nonetheless, the combination of a historically modest

10

lifestyle, sporadic payments, tragic events beyond her control and an effort, though misguided, to seek a restructuring directly through the NJHESAA tips the balance in favor of a finding that Ms. Steers seeks the discharge in good faith.

### Conclusion

It is clear that Ms. Steers's multiple tribulations render her currently unable to work. It is clear that she is not the type of student loan debtor that Congress had foremost in its mind when it developed the rigorous standards for discharge of student loans. The court has great sympathy for Ms. Steers and hopes that the treatments she is undergoing help ease her suffering soon. Nonetheless, this court is constrained by the statutory and case law precedents, not by generalized public policy. The Third Circuit has made clear that it is the burden of the party seeking the discharge of student loans to establish that there is little or no hope that the loans may be repaid in the foreseeable future. Ms. Steers has not met that burden. The NJHESAA will submit a form of judgment declaring the debt at issue in this adversary proceeding to be nondischargeable.

_/s/ Kathryn C. Ferguson_
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated: May 12, 2008